UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA )
)
)
)
v. )          Criminal Case No. 11-245 (RBW)
)
ANTHONY CARTER and )
MARCUS GURLEY, )
)
Defendants. )
)
)

## MEMORANDUM OF FINDINGS OF FACT AND STATEMENT OF REASONS IN SUPPORT OF ORDER OF PRETRIAL DETENTION

### I.    INTRODUCTION

Anthony Andre Carter and Marcus Alfred Gurley are charged with conspiracy to

distribute and possess with intent to distribute 5 kilograms or more of cocaine hydrochloride, 280

grams or more of cocaine base, and an unspecified quantity of marijuana, in violation of 21

U.S.C. § 846. The conspiracy count charges that both Mr. Carter and Mr. Gurley conspired with

their co-defendants to violate 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(A)(iii), and

841(b)(1)(D). If convicted of this conspiracy count, Mr. Carter would be subject to a maximum

penalty of 40 years in prison and Mr. Gurley would be subject to a maximum penalty of life in

prison under the Controlled Substances Act.[1] 21 U.S.C. § 846; 21 U.S.C. § 841(b)(1)(B).

On August 12, 2011, Magistrate Judge John M. Facciola presided over a detention

hearing, and after considering the arguments of defendants' counsel, ordered that defendants be

released pending trial. The government immediately appealed that decision, Mot. Emergency

---

[1] Mr. Gurley's prior conviction in 2007 in the District of Columbia Superior Court of possession with intent to distribute constitutes a "prior conviction for a felony drug offense," which raises his maximum penalty to life in prison. 21 U.S.C. § 841(b)(1)(B). Mr. Carter would be subject to a mandatory minimum of 5 years in prison.

Review, Aug. 12, 2011, ECF. No. 10, and this Court held an emergency hearing that same day.

Upon consideration of the oral representations of both parties, the Court will grant the

government's motion, vacate Magistrate Judge Facciola's August 12, 2011 order releasing

defendants from custody, and order that defendants be held without bond pending trial in this

case pursuant to 18 U.S.C. § 3142(e). The findings of fact and statement of reasons in support of

the Order of Detention are set forth below.

## II.    LEGAL STANDARD

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, dictates that a defendant may be detained

pending judicial proceedings where the government carries its burden of establishing that "no

condition or combination of conditions will reasonably assure the appearance of the person as

required and the safety of any other person and the community." *Id.* at § 3142(e), (f). The

government must first establish one of the predicates: (1) that, beyond a preponderance of the

evidence, defendant poses a risk of flight, *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir.

1996); or (2) that, by clear and convincing evidence, defendant has been shown to pose a risk to

the safety of any person or the community, 18 U.S.C. § 3142(f); *United States v. Peralta*, 849

F.2d 625, 626 (D.C. Cir. 1988). The court must then determine that the same evidence leads to

the conclusion that no condition or conditions of release will reasonably protect against the risk

that has been found.

"In determining whether the release of the defendant would endanger the community, the

court must consider any available information concerning" (1) "the nature and circumstances of

the offense charged, including whether the offense is a crime of violence or involves a narcotic

drug"; (2) "the weight of the evidence against the person"; (3) "various personal information

including character, employment, past conduct, and so on"; and (4) "the nature and seriousness

of the danger to any person or the community that would be posed by the person's release."
*United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996) (internal quotations omitted) (citing 18 U.S.C. § 3142(g)).

There is a presumption that a defendant should be detained before trial if the court finds probable cause to believe that a defendant committed "an offense for which a maximum term of imprisonment is ten years or more [as] prescribed in the Controlled Substances Act," 18 U.S.C. § 3142(e)(3)(A), or that a defendant committed "an offense under section 924(c) . . . of this title," 18 U.S.C. § 3142(e)(3)(B). The court will "presume[] that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." *Id.* § 3142(e)(3). Defendant may rebut this presumption if he offers "credible evidence" to the contrary. *Id.*; *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).

The court "may rely on a grand jury indictment to establish probable cause for the purposes of triggering the rebuttable presumption of section 3142(e)." *United States v. Williams*, 903 F.2d 844 (D.C. Cir. 1990).

## III.    DISCUSSION

The grand jury's indictment, "fair upon its face," furnishes probable cause to believe that Mr. Carter and Mr. Gurley committed the acts that constitute this offense. *See Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975); *Williams*, 903 F.2d 844. This creates a presumption of pretrial detention.

The government's proffer is that Mr. Carter and Mr. Gurley are members of a conspiracy to distribute crack cocaine, powder cocaine, and marijuana in the District of Columbia and the surrounding area. The government contends that they were supplied with narcotics by co-defendant Eugene Edward Gadson. Mr. Carter and Mr. Gurley are connected through Mr.

3

Gadson to a larger conspiracy that is situated in Silver Spring, Maryland and elsewhere in Prince George's County. The charges against defendants arose out of a 3-year investigation by the Federal Bureau of Investigation and the Metropolitan Police Department into wholesale distributors of cocaine in the region. The government's evidence against Mr. Carter and Mr. Gurley is based in part upon wire interceptions of telephone conversations between them and Mr. Gadson as well as another co-defendant, Espey Brown, Jr. Further evidence was collected on August 9, 2011, when law enforcement agents executed search warrants at both Mr. Carter's and Mr. Gurley's residences.

### A. Mr. Carter

As part of this conspiracy, Mr. Carter allegedly bought and sold narcotics, working with his co-defendant, Mr. Gadson. The government gives several examples of telephone conversations in which Mr. Gadson and Mr. Carter used coded references to drug quantities and prices. For example, on March 5, 2011, Mr. Gadson called Mr. Carter, who said, "I didn't know what you really was gon' do, right; so remember when I said I was gon' go all the way?" Mr. Gadson responded, "Yeah," and Mr. Carter replied that he was "gon' go half the way, you know what I'm saying." Mr. Gadson added "42nd Street, that's all I'm working with." After Carter asked Gadson whether he understood what he was talking about, and after Mr. Gadson asked, "Oh, down the middle?", Mr. Carter replied, "Yeah." The government believes that Mr. Gadson and Mr. Carter were negotiating the purchase of a half kilogram of cocaine, an amount described in code as "down the middle." The government contends that Mr. Gadson and his associates frequently use the coded terms "all the way" or "the whole way" to refer to a whole kilogram of cocaine and "half the way" or "down the middle" to refer to a half kilogram. References to street names—such as "42nd Street" or "33rd Street"—refer to prices for an eighth ($4,200) or an

entire ($33,000) kilogram of cocaine. Other conversations between Mr. Gadson and Mr. Carter, the government argues, show the two co-defendants describing their experiences cooking powder cocaine into crack cocaine. Based upon these conversations and the quantities of drugs described, the government believes that this evidence shows that both Mr. Gadson and Mr. Carter are familiar with preparing crack cocaine for distribution and that they are working in large quantities.

On August 9, 2011, law enforcement executed a search warrant at Mr. Carter's residence in Fort Washington, Maryland. They recovered approximately 200 grams of crack cocaine, half a kilogram of powder cocaine, and a loaded Glock 17 9-millimeter firearm. The government contends that the amount of drugs recovered is consistent with distribution and that this type of firearm is commonly used in the drug trade. During the August 12, 2011 hearing, the government argued that the discovery of this contraband at Mr. Carter's residence made its interpretation of the coded references in the Gadson–Carter cellphone conversations reasonable. The government also noted that inside Mr. Carter's residence at the time of the search were his girlfriend, a 10-year-old child, and 2-year-old child, which the government contends is "the epitome of dangerousness" given the drug quantities found inside and the loaded firearm.

In response, Mr. Carter proffers that he is capable of being supervised and that a combination of conditions could sufficiently address the issue of dangerousness to the community. He notes that he has no prior criminal history, apart from possession of an open container of alcohol, resulting in a $150 fine that he paid. He also says that he has responsibility for several minor children. He says that his longstanding employment (12 years ) at a statistics company cuts in his favor. He argues that the lack of any indications of violence in his history

suggest that he is no danger to the community, and that conditions short of detention will assure he doesn't engage further in the drug trade once released.

### B. Mr. Gurley

The government's evidence as to Mr. Gurley likewise involves intercepted cellphone conversations between him and Mr. Gadson. On several calls on March 7, 2011, the two co-defendants made references to "42nd Street," "33rd Street," (as above, referring to DC-area prices of an eighth and whole kilogram of powder cocaine) as well as coded references to the process of making or "cooking" crack cocaine from power cocaine. Mr. Gurley made references to the "cementing" process of turning powder cocaine into crack, and talked about wanting to get it right. As with Mr. Carter, the government contends that these coded references to selling large quantities of drugs shows involvement in significant narcotics distribution, while the references to the crack "cooking" process show first-hand involvement in the process of manufacturing crack cocaine from powder cocaine for distribution purposes.

On the same day as Mr. Carter's residence was searched, law enforcement executed a search warrant on Mr. Gurley's residence. There, they discovered three guns, which included two "machine gun" pistols. All of the guns were recovered from Mr. Gurley's bedroom. Possession of machine gun pistols, the government contends, is consistent with high-volume drug distribution and also "epitomizes dangerousness." The government also points out that Mr. Gurley, in 2007, had a conviction for possession with attempt to distribute cocaine in D.C. Superior Court. While the government admits that Mr. Gurley has been employed at Howard University Hospital for 11 years, it says his conviction for drug distribution during his employment there shows, in essence, that his consistent employment hasn't prevented him from engaging in serious criminal activity.

In response, Mr. Gurley proffers that release conditions will be sufficient to protect the community and prevent him from further engaging in the drug trade. He claims he lives with his parents, implying that they will be able to watch over him while he awaits trial. While he admits that he has had "court matters" before, involving possession of 20 bags of cocaine that were discovered at a traffic stop, he says that he wasn't actually observed distributing, and that during his later court proceedings he took full responsibility for his actions and complied with all of the conditions of his parole. As to the search of his residence, Mr. Gurley notes that there were no drugs or large sums of money recovered, which he believes is inconsistent with the government's claims that Mr. Gurley was dealing in large quantities of drugs for large sums of money.

## IV.    FINDINGS OF FACT

Upon consideration of the factors enumerated at § 3142(g) of the Bail Reform Act, the Court finds by clear and convincing evidence that Mr. Carter and Mr. Gurley have been shown to pose a risk to the safety of the community, and that no condition or conditions of release would reasonably protect against that risk. First, the Court finds that the nature and circumstances of the offenses clearly indicate that Mr. Carter and Mr. Gurley participated in a conspiracy involving the distribution of large amounts of narcotics in the D.C. area. Second, the Court finds that the weight of the evidence against Mr. Carter and Mr. Gurley is compelling.

Specifically, the government has proffered surveillance and recoveries of narcotics and a firearm that demonstrate Mr. Carter's role in this conspiracy, and the government noted specific incriminating examples of the evidence that it has against Mr. Carter. The evidence is no less compelling with respect to Mr. Gurley, comprising several coded conversations with co-defendant Gadson and the recovery of three dangerous weapons at Mr. Gurley's residence. Third, the Court finds that Mr. Carter's personal information does not weigh in favor of

detention. The same is not true of Mr. Gurley, because of his prior drug conviction. Nevertheless, the Court finds that the release of either Mr. Carter or Mr. Gurley would pose a serious danger to the community. The purchase and sale of narcotics is an inherently dangerous activity, particularly when accompanied by a firearm, and both Mr. Carter and Mr. Gurley pose significant dangers to the community through their participation in the distribution of powder cocaine and crack cocaine and possession of firearms while engaged in narcotics activities. There are no conditions this Court can fashion that would reasonably ensure the safety of the community if either of these defendants was not detained pending trial.

## V.    CONCLUSION

On the basis of the foregoing findings of fact and reasons, the Court will vacate Magistrate Judge Facciola's August 12, 2011 order releasing defendants from custody. Mr. Carter and Mr. Gurley will be held without bond pursuant to the August 12, 2011 oral Order of Detention.

A separate Order consistent with this Memorandum shall issue this date.


_Royce C. Lamberth_
ROYCE C. LAMBERTH
Chief Judge
United States District Court

_8/15/11_
Date